

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

———————————

No. 07-20-00077-CR

———————————

**ROBERT LOPEZ-PARKER AKA ROBERT JADE LOPEZ-PARKER, APPELLANT**

**V.**

**THE STATE OF TEXAS, APPELLEE**

On Appeal from the 140th District Court
Lubbock County, Texas
Trial Court No. 2019-418,844, Honorable Jim Bob Darnell, Presiding

February 15, 2022

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Appellant, Robert Lopez-Parker aka Robert Jade Lopez-Parker, was convicted following a jury trial of three counts of aggravated sexual assault of a disabled individual,[1] R.L.,[2] enhanced by two prior felony convictions[3] and was sentenced to three concurrent sentences of ninety-nine years' confinement. On appeal, Appellant asserts (1) there was

---

[1] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(i), (ii), (b), (e) (a felony of the first degree).

[2] To protect the privacy of the complainant, we refer to her by her initials.

[3] In November 2001, Appellant was convicted in the State of Washington of the felony offense of child molestation, third degree. In June 2013, he was convicted in federal district court in the Northern District of Texas of failing to register as a sex offender.

insufficient evidence to establish that R.L. was a "disabled individual;" and (2) Appellant's conviction is supported by hearsay testimony obtained in violation of the Confrontation Clause because her mental defect effectively made her unavailable for cross-examination. We affirm the trial court's judgment.

## Background

In December 2019, Appellant was indicted on three counts of aggravated sexual assault of a disabled person. Specifically, the indictment alleged that on or about May 2, 2018, Appellant intentionally or knowingly, and without R.L.'s consent, caused the penetration of R.L.'s mouth (count 1), sexual organ (count 2), and anus (count 3) with his sexual organ, finger, or unknown object. The State subsequently amended the indictment to include two enhancement paragraphs.

In February 2020, a jury heard evidence regarding Appellant in a three-day trial. The evidence showed that years ago, R.L. had been diagnosed with herpetic encephalitis. As a result, she suffered from seizures, lost her driver's license, and was unemployable. Over the years, R.L. underwent multiple surgeries to remove portions of her brain in an attempt to address the seizures. These surgeries left R.L. with numerous cognitive and physical problems.

Evidence indicates that R.L has struggled with short-term memory loss, although she can remember events that occurred in the distant past, as well as "important things [] that really stick with her . . ." Some seizures recur when R.L. is feeling anxious. R.L.'s left hand has contracted to the point that she has lost much of its use; she cannot button clothing. R.L.'s left foot drags when she walks; she risks falling with even slight elevation

2

changes.[4]  R.L. participated in occupational and physical therapy, counseling, and adult daycare.

According to testimony at trial, in May 2018, R.L. was living at the Stonebridge Apartments.  Due to her short-term memory loss, R.L. would often forget her whereabouts and become lost in the complex.  Family members installed a gate to assist in keeping R.L. at her apartment; staff and residents assisted R.L. in finding her way back home.  A caregiver came to R.L.'s apartment several times a day for a few hours to assist R.L. with meals[5] and with getting dressed.  She also received assistance with her medications.  R.L.'s personal physician characterized her as "kind of like a happy-go-lucky teenager, not a wild teenager, but somewhat innocent in some ways," as if she was thirteen to fourteen years old.[6]  In May 2018, R.L. was fifty-two years old.

Stonebridge Apartment's resident, Shari Morrow, testified Appellant awakened her on May 2, 2018, at 6:45 a.m., and asked to come into her apartment, purporting to need to charge his phone.  Morrow granted Appellant access.  Although the two had only spoken to each other casually before, Appellant removed his shirt when inside the apartment and requested that Morrow rub his back.  Appellant also told Morrow of the time that had passed since he last had sex.  Morrow instructed Appellant to leave.

Appellant left Morrow's apartment.  At approximately 7:30 a.m. on the same day, R.L.'s son arrived at R.L.'s apartment to bring her aspirin.  When R.L. did not answer the

---

[4] At time of trial, R.L. was wheelchair-bound.

[5] R.L.'s son testified she had difficulty preparing microwave dinners and in the absence of assistance, would primarily eat cereal bars, sandwiches, and almonds.  There was no strength in her left arm and she was unable to grip or open food containers with her left hand.  This condition also made it difficult for her to dress herself.

[6] Her caregiver, personal physician, and family members agreed R.L.'s memory was good for recalling important or traumatic events.

3

door, the son let himself in. He heard noises from R.L.'s bedroom and found the bedroom door closed. R.L. sounded nervous and embarrassed when responding to her son's inquiries and would not come out of the bedroom. He thought R.L. was encountering problems getting dressed; he left the aspirin and left the apartment to catch a flight.

Tonya Beene, R.L.'s caregiver, testified she arrived at R.L.'s apartment around 9:30 a.m. the same day. Again, R.L. did not answer the door. Like R.L.'s son, Beene entered the apartment and found the closed bedroom door to be out of the ordinary. After Beene knocked on the door to inquire if R.L. was okay, R.L. replied, sounding winded, and asked Beene to leave. Beene believed something was wrong and remained until R.L. came out of the bedroom. R.L. said she had a visitor and was not acting as her usual self. Shortly thereafter, a stranger emerged from the bedroom wearing a camouflaged ball cap and grey shirt. When spoken to, he did not respond and left the apartment.

After arriving at work on May 2, Jazmin Fitzgerald, Stonebridge's property manager, observed Appellant at the office, wearing a camouflaged ball cap and long-sleeve shirt. Fitzgerald had given Appellant's daughter a ride to school after repeatedly calling Appellant and receiving no answer. Appellant explained he had been hanging out with friends and had coffee with Morrow.

After Appellant left the office, R.L. and Beene came to the office and reported to Fitzgerald that R.L. had been sexually assaulted. Beene described the alleged assailant as wearing a camouflaged ball cap and a green/blue shirt, and matching Appellant's description who Fitzgerald had just seen. When R.L. described the incident to her daughter over the telephone, R.L. was screaming and crying, saying she had been raped.

4

The police were notified. Upon their arrival, Fitzgerald described Appellant to the police while Appellant left the premises on foot.

R.L. was taken to the hospital where she underwent an examination by a forensic, Sexual Assault Nurse Examiner (SANE). During the oral history portion of the examination, R.L. was visibly upset and crying. R.L. indicated that she had answered her apartment door to find a man who said he worked with maintenance and needed to enter her apartment. R.L. said she trusted the man, but that once she granted him access to her apartment, he immediately led her to the bedroom where he removed her clothes and his. R.L. said the man inserted his fingers and a thin vibrator in her anus; she said it hurt and requested him to stop. The man also inserted his penis into R.L.'s mouth and forced her to perform oral sex until he ejaculated. R.L. also reported the man inserted something in her vagina—possibly his fingers, the vibrator, or his penis. The man also reportedly kept putting his penis between her breasts and forced R.L. to rub his penis with her hands.

During the examination, the SANE nurse documented discolorations, bruising, and a superficial abrasion with redness and petechia on R.L.'s vagina—the first layer of skin had been rubbed off. She also observed torn skin with abrasions, as well as abrasions to the outer membrane of R.L.'s vagina and redness to her hymen. The SANE nurse also observed swelling and bulbular areas of red purple discoloration to R.L.'s anal area; R.L. complained of pain when the area was swabbed. The SANE nurse testified that R.L.'s injuries were consistent with her oral history. Lab testing confirmed the presence of Appellant's DNA between R.L.'s breasts and on her neck.

5

Appellant was arrested on May 3, 2018. When the property manager visited Appellant at the jail and asked about why he did it, Appellant responded "something to the lines that -- of – 'She wanted it,' or 'It was okay,' or something to that effect."

R.L. testified at trial. Without objection, she answered questions about her ability to remember events during the following exchange:

Q. Can you tell the jury a little bit about things that are hard for you to remember, like how your memory works?

A. I have good and bad days. If I have a good night's rest I can remember better the next day. If I do some things one day, if I go to bed that night, I might forget the next day.

Q. Okay. Can you remember long-term things or people that have been in your life for a while?

A. Yes.

Q. Okay. Do you sometimes forget if you've met someone?

A. Yes.

Q. Okay.

A. Unless something, you know, out of the ordinary has happened.

R.L. also testified about the events of May 2, 2018. She testified someone knocked on her door and told her he was from maintenance. When he entered her apartment, R.L. said the following:

He came and he attacked me. The worst thing I remember is he pushed me to the floor and held my shoulders down, and he raped me. I was fighting back as well as I can, and when he tried to—and this is very personal, but when he tried to go to the rectum, I just—I couldn't do it, and I wouldn't let him do it.

R.L. said she did not want to have sex with the man, but that he tried to put his penis in her anus. R.L. could not recall Appellant putting anything in her mouth and said she

6

thought the events took place in her living room. When the State's direct examination was completed and cross-examination was to begin, Appellant's attorney replied that he had no questions.

At the conclusion of the State's case-in-chief, Appellant called Kevin Funk, M.D., to testify. Dr. Funk did not personally examine R.L., but relied on her medical records and testimony as the basis for his opinions, including the aforementioned medical information about R.L.'s prior surgeries as well as physical and mental limitations. Dr. Funk testified that on May 2, 2018, R.L. was disabled. Considering a broad spectrum of mental disability ranging from very minimally disabled to extremely severe disabled, Dr. Funk described R.L. as a "medium disabled patient." Dr. Funk opined as follows:

> I would judge [R.L.] being mid, mid-way, because she was still able to live independently, still able to give her own medical consent to medical care, that's medications, prescriptions. She required a lot of assistance to be able to live as she did, but she seemed to be able to make her decisions quite well and decide, you know—her decisions may not be appropriate sometimes such as when she was wandering around her apartment complex. You know, we don't know what memory or what was activated at that point that made her think that she needed to leave the apartment, and then forget why she was out there. But she did have the ability to at least give medical consent that I could see in the medical records multiple times.

(alteration added in brackets).

At the trial's conclusion, the jury found Appellant guilty of three counts of aggravated sexual assault of a disabled person enhanced by two prior felony convictions and was sentenced to three concurrent sentences of ninety-nine years. This appeal followed.

7

Analysis

Appellant alternatively argues (1) the evidence is insufficient to prove R.L. was a "disabled individual" on May 2, 2018, as necessary to prove the assault was aggravated; or (2) if the evidence of her disability is sufficient, R.L.'s disability was such that it rendered her unavailable for cross-examination, violating Appellant's rights under the Confrontation Clause to the United States Constitution.

In reviewing the sufficiency of the evidence to support a conviction, we apply the standard set forth in *Jackson v. Virginia*, 443 U.S. 397, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). *See Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010). Under that standard, when assessing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 902. The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimonies, and we will not usurp this role by substituting our judgment for that of the jury. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). We also measure the sufficiency of the evidence against the elements of the offense as defined by a hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 334, 240 (Tex. Crim. App. 1997).

Evidence of R.L.'s Disability

Appellant was indicted for aggravated sexual assault of a disabled individual. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(i), (ii)(C), and (b)(3). In a prosecution under section

8

22.021, the term "disabled individual" is defined as a "person older than 13 years of age who by reason of age or physical or mental disease, defect, or injury is substantially unable to protect the person's self from harm or to provide food, shelter, or medical care for the person's self." *Id.* at (b)(3).

We conclude the evidence was sufficient to permit the jury to find beyond a reasonable doubt that on May 2, 2018, R.L., by reason of physical or mental disease, defect, or injury was substantially unable to protect herself from harm or to provide food, shelter, or medical care for herself. The testimony of R.L.'s family members, caregiver, and personal physician established that since at least 2010, R.L. had been diagnosed with herpetic encephalitis which caused seizures. Due to multiple surgeries that removed portions of her brain, R.L. suffered from numerous cognitive and physical problems. R.L. was unable to drive or work. R.L. often became lost in her own apartment complex, requiring the assistance of staff and residents to return home. She presented as a thirteen- to fourteen-year-old despite being fifty-two.

The jury heard that R.L. found it difficult to prepare her own meals. When healthy meals were not provided for her, R.L. often ate cereal bars, sandwiches, and almonds. R.L. could not dress herself without assistance. She no longer had the function of her left hand; her left foot dragged when she walked. She was a fall risk and had a record of falling. She found it difficult to navigate steps or imperfections in sidewalks and pavement. During the time the man identified as Appellant "attacked" and "raped" her, R.L. told the jury, "I was fighting back as well as I can."

Dr. Funk, Appellant's own expert, agreed that R.L. "required a lot of assistance to be able to live as she did." He opined that on the broad spectrum of very minimally

9

disabled to extremely severe disabled, R.L. was a "medium" or "mid-way" disabled individual.

Viewing the evidence in the light most favorable to the verdict, we find that a rational trier of fact could have found beyond a reasonable doubt that R.L. was a disabled individual as defined by section 22.021(b)(3) because she was substantially unable to protect herself from harm or provide food, shelter, or medical care for herself. Appellant's first issue is overruled.

Alleged Confrontation Clause Violation

Appellant contends his conviction was obtained in violation of the Confrontation Clause because it was supported by hearsay statements made by R.L. to third parties, and that, due to R.L.'s mental defect, "all Appellant had was other people's recitation of those statements." He also asserts that although R.L. testified at trial, she could not be rigorously cross-examined due to memory loss, fragility, and being "muddled." We disagree.

"The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him." *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015) (citing *Pointer v, Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)). Its main purpose is to ensure that the defendant has a chance to cross-examine witnesses because cross-examination is the principal means of testing their credibility and veracity. *Johnson v. State*, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016). Thus, the right of confrontation includes not only the right to compel a witness to take the stand at trial, but also the opportunity to conduct a meaningful and effective cross-examination. *Coronado v. State*, 351 S.W.3d 315, 319 (Tex. Crim. App. 2011).

10

To implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial, and (2) be testimonial in nature. *Crawford v. Washington*, 541 U.S. 36, 50-52, 59 (2003). However, "when the declarant appears for cross-examination at trial, the *Confrontation Clause* places no constraints at all on the use of his prior testimonial statements."[7] *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) (quoting *Crawford*, 541 U.S. at 59 n.9). Ordinarily, "memory loss does not render a witness 'absent' for Confrontation Clause purposes if she is present in court and testifying." *Woodall*, 336 S.W.3d at 644. A criminal defendant is not deprived of Sixth Amendment rights by having "a less than optimal opportunity for cross-examination." *Balderas v. State*, 517 S.W.3d 756, 779 (Tex. Crim. App. 2014) (cleaned up).

Far from Appellant's suggestion that R.L. was nothing more than "a warm body in the witness chair," she was present and testified at trial. Before trial, R.L. was found competent to testify following a hearing; that determination is not challenged on appeal. She testified she had a clear recollection of the sexual assault because it was a memory "that hurt the most." She also recalled speaking to nurses, about Appellant's attempt at anal sex, and about Appellant pinning her down and forcing himself on her. She recalled Appellant telling her that she would like it and threatening to come back.

Melissa Henry, M.D., R.L.'s physician for eight or nine years, testified that the eight medications which R.L. was prescribed did not affect her cognition, memory, or mental function. Despite R.L.'s physical and cognitive issues, Dr. Henry opined R.L. was capable of making decisions for herself. R.L. may suffer from some short-term memory loss, but

---

[7] Neither Appellant nor the State assert the statements at issue are non-testimonial.

had no problems with long-term memory. When asked if R.L. is "in a position to describe major events even if they're a couple years back or something," Dr. Henry answered in the affirmative. Over Appellant's objection, Dr. Henry read from her medical records an entry from February 2019: "[R.L.] currently complains of issues of anxiety ever since she was raped about a year ago while home alone."

Although R.L., like other victim witnesses, could not recall every detail of her assault at trial, this does not render her unavailable for cross-examination or violate the Confrontation Clause. *Woodall*, 336 S.W.3d at 644. While Appellant interposed occasional hearsay objections, he does not assign any error on appeal to the court's rulings. Important to the issue Appellant does present is this: R.L. was available for cross-examination, but Appellant made the trial decision not to ask any questions. No Confrontation Clause problem is presented here. Appellant's second issue is overruled.

Conclusion

We affirm the trial court's judgment.

Lawrence M. Doss
Justice

Do not publish.

12